*1356 MICHEL, Chief Judge.
DefendanL-Appellant Levitón Manufacturing Company, Inc. (“Levitón”) appeals the district court’s award of attorney fees and costs to Plaintiff-Appellee Shanghai Meihao, Inc. (“Meihao”) based on inequitable conduct and vexatious litigation. We vacate and remand for the reasons below.
I. Background
On October 22, 2003, Levitón filed U.S. Patent Application No. 10/690,776 (“Ger-main application”), which claims priority to a February 3, 2003 provisional application. Greenberg Traurig attorneys Paul Sutton, Barry Magidoff, and Claude Narcisse filed and prosecuted the Germain application. It lists Franz Germain and five others as co-inventors. Each of these inventors submitted to the U.S. Patent and Trademark Office (“PTO”) a sworn declaration that he was an original inventor of the subject matter which was claimed.
Six months later, on April 19, 2004, Leviton filed U.S. Patent Application No. 10/827,093, which later issued as U.S. Patent No. 6,864,766 (“the '766 patent”). The '766 is a third-generation continuation of U.S. Patent No. 6,246,558 (“the '558 patent”). The application for the '558 patent was filed on August 20, 1999, and Levitón has claimed that the '766 patent is entitled to this priority date. Nicholas DiSalvo and William Ziegler are named as the inventors of the '766 patent. Both of these inventors also submitted to the PTO a sworn declaration that he was an original inventor of the subject matter which was claimed.
The '766 patent and the Germain application have no common inventors, and neither claims priority to the other. The '766 patent’s claimed 1999 priority date is three and a half years before Germain’s claimed 2003 priority date. The '766 patent and Germain have many claims that are nearly identical. For example, the only difference between claim 1 of the '766 patent and claim 31 of the Germain application is that claim 1 recites “at least one moveable bridge” whereas claim 31 recites “a movable bridge.” And dependent claims 3, 4, 13 and 14 of the '766 patent are identical to Germain claims 32, 31, 43 and 44.
Meihao and Levitón offer different explanations as to the similarity of the claims. Meihao contends that Narcisse “copied” the claims from the Germain application into the application that matured into the '766 patent. Levitón explains the similarity by stating that several months after Narcisse filed the Germain application, he met with several Levitón engineers, including William Ziegler, one of the inventors of the '558 patent. At that meeting, Narcisse learned that the broad reverse-wiring protection concept he claimed in the Germain application had actually been described in the '558 patent over three years earlier, having already been invented by Ziegler and DiSalvo. Afterwards, Narcisse prepared a continuation of the '558 patent with claims directed to that feature.
During the prosecution of the '766 patent, Levitón did not disclose the Germain application or the fact that certain claims had been copied from Germain into the application for the '766 patent. Moreover, Levitón did not inform the PTO that it had previously submitted a sworn declaration in which other individuals (the Germain inventors) claimed to be inventors of subject matter very similar to that which was now recited in the application for the '766 patent.
In June 3, 2005, two months after the '766 patent issued, Levitón disclosed the *1357 '766 patent, the '558 patent, and thirty-other references during the prosecution of the Germain application. In September 2005, having learned of the substantively identical claims, the PTO issued a double-patenting rejection of the Germain application in light of the '766 patent. Levitón cancelled the similar claims.
A reexamination of the '766 patent was requested on June 6, 2005. Levitón did not disclose the Germain application or the related litigation to the PTO during the seven months in which the examiner reconsidered the patentability of the '766 patent. On February 17, 2006, the examiner confirmed all claims of the '766 patent, and the reexamination requestor appealed. Levitón filed its appeal brief on June 16, 2006, but did not disclose the Germain application or related litigations to the PTO, though it had been aware of inequitable conduct allegations for over a year.
Narcisse first referenced the Germain application and asserted that it was not material information in a memorandum to the PTO dated August 7, 2007. Although Narcisse titled his memorandum “Information Disclosure Statement” (“IDS”), it is not formally an IDS because it does not meet any of the requirements for an IDS. Narcisse also submitted several standard PTO forms titled “Information Disclosure Statement by Applicant” that comply with PTO rules, but these IDS forms did not list the Germain application.
During the district court case, Meihao sought discovery of the facts related to the inequitable conduct defense. Meihao argued that Leviton’s counsel unreasonably and self-servingly tried to avoid discovery of Leviton’s own misconduct. When Meihao issued subpoenas to Sutton, Magidoff, and Narcisse, the witnesses did not object, did not produce documents, and did not appear for their scheduled depositions. Levitón belatedly moved to quash primarily on the ground that the witnesses were acting as Leviton’s litigation counsel. In March 2007, Greenberg Traurig withdrew and was replaced by Nixon Vanderhye.
Narcisse and Magidoff subsequently appeared for depositions, and Leviton’s new counsel made numerous privileged advice and work product objections and repeatedly instructed the witnesses not to answer. During Narcisse’s deposition, counsel made 96 privileged advice and work product objections, and over a third of the time explicitly instructed Narcisse not to answer. Many of these questions were about the relationship between the Germain application and claim 1 of the '766 patent, or Narcisse’s rationale for failing to disclose the Germain application to the PTO. For example, Narcisse declined to answer the following questions claiming the work-product exception:
• Can you tell me with respect to Claim 1 where you got the language for Claim 1?
• So isn’t it a fact that Claim 1 of the '766 application was copied from Claim 31 of the Germain application?
• Can you tell me where you got the phrase, “move-able bridge”?
• Did you consider disclosing the Ger-main application to the PTO?
• How do you explain the similarity in claim language?
Magidoff refused to answer similar questions, also on advice and objection by counsel. The district court found that these objections were baseless.
Another round of briefing ensued, with Meihao seeking an order compelling Narcisse and Magidoff to appear for further *1358 deposition and to fully answer Meihao’s questions, and also compelling Sutton to appear for deposition. The matter was argued and submitted to Magistrate Judge Gauvey on September 17, 2007. Meihao’s motions to compel were still pending when Levitón moved to dismiss the case in November 2007, but the magistrate judge noted that he was about to grant them.
On November 28, 2007, Levitón moved to dismiss the case. Levitón asserts that it dismissed the case because it succeeded in forcing Meihao to stop selling older-model, allegedly infringing products. Meihao alleges the real reason Levitón moved to dismiss its case was that it wanted to avoid a finding that the '766 patent is unenforceable. Levitón has more than 30 different issued patents and patent applications that relate to the '766 patent, and Leviton’s counsel of record on the '766 patent was also counsel of record in the PTO on several hundred Levitón patents. The district court dismissed the case with prejudice on December 17, 2007 and gave Meihao leave to file a motion for fees and costs.
The magistrate judge held a hearing on the motion for fees and costs on September 3, 2008 and issued a 128 page Memorandum Opinion on December 23, 2008 in which she found that Levitón had committed inequitable conduct, had engaged in a strategy of vexatious litigation, and that an award of fees to Meihao was proper. District Judge Andre M. Davis issued an opinion on May 12, 2009 accepting Magistrate Judge Gauvey’s report and recommendations. The district court entered two money judgments in favor of Meihao together totaling $1,046,353.10 in costs and reasonable attorney fees.
II. Discussion A. Attorney Fees
The Patent Act provides, “The court in exceptional cases may award reasonable attorney fees to the prevailing party.” 35 U.S.C. § 285. “The prevailing party may prove the existence of an exceptional case by showing: inequitable conduct before the PTO; litigation misconduct; vexatious, unjustified, and otherwise bad faith litigation; a frivolous suit or willful infringement.” Epcon Gas Sys., Inc. v. Bauer Compressors, Inc., 279 F.3d 1022, 1034 (Fed.Cir.2002). We review a district court’s finding that a case is “exceptional” within the meaning of § 285 for clear error. Forest Labs., Inc. v. Abbott Labs., 339 F.3d 1324, 1328 (Fed.Cir.2003). Once a case is determined to be exceptional, we review the district court’s decision to award attorney fees under an abuse of discretion standard. Id.
The district court based its grant of attorney fees on both (1) inequitable conduct and (2) vexatious litigation. Levitón challenges each of these holdings, as we discuss below.
B. Inequitable Conduct
 We review the district court’s decision to grant summary judgment for inequitable conduct de novo. See Eisai Co. v. Dr. Reddy’s Labs., Ltd., 533 F.3d 1353, 1359 (Fed.Cir.2008). Summary judgment may only be granted where there are no genuine issues of material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). To prevail on inequitable conduct, an accused infringer must show that the applicant: “(1) made an affirmative misrepresentation of material fact, failed to disclose material information, or submitted false material information, and (2) intended to deceive the [PTO].” Cargill, Inc. v. Canbra Foods, Ltd., 476 F.3d 1359, 1363 (Fed.Cir.2007).
1. Materiality
Under our scattered precedents, information may be considered material if *1359 there is a “substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent.” PerSeptive Biosystems, Inc. v. Pharmacia Biotech, Inc., 225 F.3d 1315, 1321 (Fed.Cir. 2000); see also Digital Control, Inc. v. Charles Machine Works, 437 F.3d 1309, 1314 (Fed.Cir.2006) (holding that omissions and misstatements are material if “a reasonable examiner would have considered such [information] important in deciding whether to allow the ... application”). Information concealed from the PTO “may be material even though it would not invalidate the patent.” Larson Mfg. Co. v. Aluminart Prods. Ltd., 559 F.3d 1317, 1327 (Fed.Cir.2009) (quoting Li Second Family Ltd. v. Toshiba Corp., 231 F.3d 1373, 1380 (Fed.Cir.2000)). However, “a withheld otherwise material reference is not material if it is merely cumulative to, or less relevant than, information already considered by the examiner.” Larson, 559 F.3d at 1327.
a. Germain Application
We agree with Meihao and the district court that Leviton’s failure to disclose the Germain application was material. Levitón argues that its failure to disclose Ger-main was not material for any of the reasons cited by the district court, contending that: (1) Levitón did not “copy” claims under 37 C.F.R. § 10.23(c)(7); (2) the disclosure of Germain would not be material to inventorship; (3) the disclosure of Ger-main would not be material to double patenting; and (4) the disclosure of Germain would not be material to written description. We consider each of these arguments below.
Levitón first challenges the district court statement that “information on ‘copying’ of claims is essentially material per se under the PTO regulations,” citing 37 C.F.R. § 10.23(c)(7) (2004).[1] Section 10.23(e)(7) requires identifying to the PTO “a patent or patent application of another from which one or more claims have been copied.” Levitón alleges that § 10.23(c)(7)’s reference to “copying” is only directed to the interference context because it refers to provisions that address a request for an interference. In this context, Narcisse’s interpretation “of another” meant another patent owner, and not another inventive entity. Levitón further argues the concept of “copying” is a term of art used exclusively in the interference context.
Meihao responds that “copying” means “copying” and there is no language that limits it to the interference context. Moreover, Meihao responds that the rules do not apply solely to interferences involving different patent owners, but also explicitly apply to interferences involving different patent applicants. See 37 C.F.R. § 1.41(a) (“Unless the contrary is indicated the word ‘applicant’ when used in these sections refers to the inventor or joint inventors who are applying for a patent.”).
We agree with Levitón that § 10.23(c)(7) is primarily directed to the interference context. Section 10.23(c)(7) specifically refers to § 1.604(b) and § 1.604(7)(e), both of which address a request for an interference. Levitón did not request declaration of an interference in this case. Indeed, an *1360 interference generally cannot be declared between applications by a single party. Thus, we agree with Levitón that § 10.23(c)(7)’s express prohibition on the “copying” of claims is not applicable to the instant situation.
Second, Levitón argues that the Ger-main application was not material to inventorship. Levitón contends that if the '766 claims are supported by the common specification of the '766 and '558 patents, then Germain and his coinventors could not have conceived the inventions in the '766 claims, because those inventions were described several years earlier in the '558 patent.
Meihao responds that a reasonable examiner would want to know if two different applications had two different sets of inventors that both claimed to make the same invention. Meihao contends that an examiner would not automatically discount the Germain application in determining inventorship simply because it had a later priority date because no person may patent an invention that “he did not himself invent.” 35 U.S.C. § 102(f).
We agree with Meihao that the Germain application was material to inventorship. Even if one application had an earlier priority date, the examiner would have to evaluate which set of inventors actually conceived of the invention. See Invitrogen Corp. v. Clontech Labs., Inc., 429 F.3d 1052, 1063 (Fed.Cir.2005) (Conception of an invention is the “formation in the mind of the inventor, of a definite and permanent idea of the complete and operative invention, as it is hereafter to be applied in practice.”); Hitzeman v. Rutter, 243 F.3d 1345, 1358-59 (Fed.Cir.2001) (“[A]n inventor who failed to appreciate the claimed inventive features of a device at the time of alleged conception cannot use his later recognition of those features to retroactively cure his imperfect conception.”). It is not enough for Levitón to claim that the earlier specification does in fact support the claims. Neither an inventor nor his counsel may graft claims onto an earlier specification if those claims do not reflect what the inventor actually invented at the time of the earlier application.
The copying of certain claims from the Germain application with one set of named inventors into the '766 patent application with another set of inventors suggests that the named inventors may not have, in fact, invented the claimed subject matter. Here, Levitón submitted patent applications and sworn inventorship declarations from two different sets of inventors, both attesting that they were inventors of the claimed subject matter. Had the examiner been aware that different Levitón employees each claimed to be first inventors of the same subject matter recited in the same claims, it would have raised serious questions regarding inventorship-an issue that is clearly material to patentability. Moreover, as we have acknowledged, “whether the inventorship of the patents as issued is correct does not determine the materiality of the statements in this case, just as whether concealed prior art would actually invalidate the patent is irrelevant to materiality.” See PerSeptive, 225 F.3d at 1322; Larson, 559 F.3d at 1327. Even if the examiner might have ultimately concluded that DiSalvo and Zeigler invented the claimed subject matter, the nearly identical claims raise a substantial inventorship question that would have required additional investigation by the examiner. Thus, we hold that Leviton’s failure to disclose the Germain application during the prosecution of the '766 patent was material.
Third, Levitón argues that the district court erred by considering the Germain *1361 patent material to double patenting. According to Levitón, the intent of the double-patenting rule is to allow the PTO to prevent two patents from issuing at different times with the same claims. Levitón contends that Narcisse gave the PTO the information to evaluate the double-patenting issue during the prosecution of the later-priority (but earlier-filed) Germain application. Moreover, Levitón contends that the PTO could not use the Germain application to make a double-patenting rejection in the '766 patent prosecution because the examiner would have allowed the earlier priority patent to issue if there were no other rejections remaining.
Meihao responds that a reasonable examiner would consider Germain material to double patenting. Moreover, Meihao points out that, under Manual of Patent Examining Procedure (“MPEP”) Section 804, the PTO examiner would first issue a provisional double patenting rejection to both the application for the '766 patent and the Germain application before withdrawing one of those rejections.
We hold that the copying of claims would be material to the issue of double-patenting because a reasonable examiner would want to consider both applications. Although it is unlikely that the examiner would ultimately apply the double patenting rejection to the application with an earlier priority date, the double patenting issue would typically lead to an immediate provisional rejection as to each application. See MPEP Section 804. Once all other rejections are resolved, the provisional rejection can be withdrawn to one application, which will then issue as a patent. While the rejection may be withdrawn as to the application with the earlier filing date, it is not required by the MPEP Guidelines. Thus, the PTO could have rejected the '766 patent for double-patenting. Accordingly, we conclude that knowledge of the Germain application during the '766 patent prosecution would be material.
Finally, Levitón argues that the disclosure of the Germain application during the '766 prosecution would not have affected the examiner’s conclusion that the claims were supported by the specification. Levitón notes that the examiner stated (in the context of the double-patenting issue) that the '766 patent “disclose[s] everything claimed [in Germain] except the use of a latched reset lockout with the interrupting device.” Levitón argues that nobody has had trouble recognizing that the claimed “movable bridge” is described in the '766 specification as the movable contact arms 50 and 70. Levitón argues that the written description issue only concerns whether the description would allow persons of ordinary skill in the art to recognize that the inventor invented that which is claimed.
Meihao responds that this is improper “but for” argument of what the examiner would have done. Meihao argues that in not disclosing Germain, Levitón withheld the very reference that would have caused any reasonable examiner to. question the '766 patent application’s compliance with the statute.
We agree with Levitón that the Germain application is not material to the written description requirement. Pursuant to 35 U.S.C. § 112, ¶ 1, the '766 patent specification must support its claims. The Ger-main application does not affect whether the '766 patent specification supports its claims, and thus should not affect a reasonable examiner’s assessment. Nevertheless, because a reasonable examiner would want to consider the Germain application with respect to inventorship and *1362 double patenting, the district court correctly concluded that the failure to disclose the Germain application during the '766 patent prosecution was material.
b. Related Litigation
Levitón also challenges the district court’s conclusion that Leviton’s failure to disclose related litigation during the prosecution of the '766 patent was material. Meihao identified twelve cases filed before the '766 patent issued involving its parent patents that Meihao contends should have been disclosed during the prosecution of the '766 patent. Levitón does not dispute that the parent patents of the '766 patent were litigated in at least a dozen lawsuits filed before the '766 patent issued. Levitón also does not dispute that it was aware of those cases, as well as the allegations of invalidity and unenforceability made in many of them. Levitón instead argues that the fact that Levitón succeeded on the validity of those patents shows that those litigations were not material. We disagree. Levitón violated the requirements of MPEP § 2001.06(c) and this Court’s precedent by failing to bring these cases to the PTO’s attention. See Nilssen v. Osram Sylvania, Inc., 504 F.3d 1223, 1224 (Fed.Cir.2007) (holding that the existence of earlier related litigation itself was material information). Levitón should have disclosed the existence of the cases themselves and material information from those cases, not just invalidating prior art. MPEP § 2006(c) expressly notes that defenses raised against validity or charges of inequitable conduct would be material to patent examination:
For example, the defenses raised against validity of the patent, or charges of “fraud” or “inequitable conduct” in the litigation, would normally be “material to the examination” of the reissue application. It would, in most situations, be appropriate to bring such defenses to the attention of the Office by filing in the reissue application a copy of the court papers raising such defenses. At a minimum, the applicant should call the attention of the Office to the litigation, the existence and the nature of any allegations relating to validity and/or “fraud,” or “inequitable conduct” relating to the original patent, and the nature of litigation materials relating to these issues.
Thus, Levitón should have disclosed these litigations, not merely ones where a patent was invalidated. The failure to disclose such litigations normally would be material, and we conclude that they are material here.
2. Intent to Deceive
We next consider whether Levitón withheld the Germain application and related litigation with an intent to deceive the PTO. This Court has held that the intent to deceive must be “viewed in light of all the evidence.... Intent need not, and can rarely be, proven by direct evidence. Rather, intent to deceive is generally inferred from the facts and circumstances surrounding the applicant’s overall conduct.” Impax Labs., Inc. v. Aventis Pharmaceuticals, Inc., 468 F.3d 1366, 1374-75 (Fed.Cir.2006); see also Cargill, Inc. v. Canbra Foods, Ltd., 476 F.3d 1359, 1364 (Fed.Cir.2007) (“[Bjecause direct evidence of deceptive intent is rarely available, such intent can be inferred from indirect and circumstantial evidence.”). Even if the nondisclosed information is of “relatively high materiality,” however, inequitable conduct cannot be found where “[the patentee] offer[s] a plausible, good faith *1363 explanation for why [the nondisclosed information] was not cited to the PTO.” Warner-Lambert Co. v. Teva Pharms. USA Inc., 418 F.3d 1326, 1348 (Fed.Cir. 2005). Moreover, “[a]n accused infringer cannot carry its threshold burden simply by pointing to the absence of a credible good faith explanation.” See Larson Mfg. Co. v. Aluminart Prods. Ltd., 559 F.3d 1317, 1341 (Fed.Cir.2009) (citing Star Scientific, Inc. v. R.J. Reynolds Tobacco Co., 537 F.3d 1357, 1368 (Fed.Cir.2008)). We rarely affirm a grant of summary judgment of inequitable conduct, and in those cases where we have affirmed, the applicants did something other than fail to disclose a commonly owned application or related litigation. See, e.g., Paragon Podiatry Lab, Inc. v. KLM Labs. Inc., 984 F.2d 1182 (Fed.Cir.1993) (affirming inference of intent to deceive “not simply from the materiality of the affidavits, but from the affirmative acts of submitting them, their misleading character, and the inability of the examiner to investigate the facts”).
Meihao argues that the district court properly found that Levitón intended to deceive the PTO. Meihao refers to a number of findings by the magistrate judge that support its conclusion: (1) Narcisse failed to provide a credible explanation for why he did not notify the PTO about the “copying” of claim language from the Ger-main application; (2) Levitón had a strong-motive to deceive because moving the claims from the Germain application to the '766 patent would allow Levitón to avoid several years of potentially invalidating art; (3) Narcisse’s experience and knowledge meant that he should have known about his duty to disclose the Germain application; and (4) there was no evidence of countervailing good faith in Leviton’s dealings with the PTO.
Levitón counters that the magistrate judge improperly inferred an intent to deceive. According to Levitón, at the minimum, genuine issues of material fact preclude summary judgment of inequitable conduct. Levitón argues that Narcisse offered a reasonable explanation for why he did not inform the PTO of the Germain application: he did not believe that Ger-main was prior art because the priority date of the '766 patent was at least three years before Levitón filed the Germain application.
We hold that there are genuine issues of material fact which preclude summary judgment for inequitable conduct, and we remand for an evidentiary hearing. The district court inferred an intent to deceive based on Narcisse’s failure to advise the PTO of the Germain application and related litigation, which is an omission, not an affirmative misrepresentation. We have not previously affirmed a grant of summary judgment based on a failure to disclose a commonly owned application or related litigation, and we decline to do so on the facts of this case. See, e.g., Paragon Podiatry, 984 F.2d 1182. While a district court may make inferences based on the evidence, the district court’s inference was not the only reasonable one based on the record. See Star Scientific, 537 F.3d at 1366 (“Further, the inference must not only be based on sufficient evidence and be reasonable in light of that evidence, but it must also be the single most reasonable inference able to be drawn from the evidence to meet the clear and convincing standard.”). During his deposition, Narcisse provided a plausible explanation for why he did not disclose the Germain application: “[b]ecause the Ger-main application is not a prior art reference to the '766 application.” Narcisse further explained, “[The Germain applica *1364 tion] was not material to the patentability of the '766 application____ [I]t was clear that the '766 application was prior art ... to the Germain. And so the Germain was not prior art to the '766, and therefore the Germain application didn’t come into the picture at all.” While we conclude that Narcisse’s failure to disclose the Germain application was material, we cannot agree that Narcisse’s explanation of his thoughts at the time were unreasonable as a matter of law. See Warner-Lambert, 418 F.3d at 1348. Thus, the district court could not find Narcisse’s explanation to be implausible without an evidentiary hearing.
Meihao correctly points out that Narcisse failed to provide any explanation at his deposition for why he did not disclose related litigation. However, the failure to provide "an explanation is not independently dispositive of whether a patent prosecutor intended to deceive the PTO. See Larson, 559 F.3d at 1341. In addition, Narcisse later submitted a memorandum during '766 reexamination proceedings disclosing all of the related litigations, and he summarized the inequitable conduct allegations that had been made with respect to the Germain application. While this does not necessarily demonstrate good faith, it may be evidence of good faith. The district court could not find that Levitón intended to deceive the PTO by failing to notify the PTO of related litigations without an evidentiary hearing, i.e., as a matter of law.
Meihao also contends that Levitón cannot now argue that the magistrate judge erred by not hearing live testimony from Narcisse because Levitón never sought to present live testimony. See, e.g., Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co., 840 F.2d 985, 990-91 (1st Cir. 1988) (holding that “an unsuccessful party is not entitled as of right to de novo review ... of an argument never seasonably raised before the magistrate [judge]”). However, in its opposition to Meihao’s motion for costs and attorney fees before the magistrate judge, Levitón specifically noted, “[T]o rule on Meihao’s motion, the Court would need to reopen discovery and conduct a bench trial on inequitable conduct ....”[2] Levitón repeated this argument before the district judge in objecting to the magistrate judge’s report and recommendation, and specifically complained about the lack of live testimony. Thus, Levitón is entitled to argue that it was denied an evidentiary hearing.
Because we hold that genuine issues of material fact exist that preclude summary judgment for inequitable conduct, we vacate the determination of the district court and remand for a bench trial.
C. Vexatious Litigation
We also vacate and remand the district court’s decision and fee award with respect vexatious litigation. We first note that the district judge and magistrate judge expressly acknowledged that an attorney fees award on litigation misconduct alone would justify only a smaller award, and thus we must necessarily remand for a determination of fees. In addition, the district court’s vexatious litigation determination appeared to depend at least in part on the holding of inequitable conduct, which we vacated. For example, the district judge reasoned, “The inference is inescapable that the misguided efforts by *1365 Leviton’s counsel to resist discovery on inequitable conduct arose in significant part because it was members of that firm that had engaged in such conduct.” This appears to tie the analysis of Leviton’s discovery intent to the court’s conclusion on inequitable conduct. Thus, because we find that the inequitable conduct holding must be vacated, we must also vacate the vexatious litigation finding.
In addition, we are concerned with part of the district court’s analysis related to the work product doctrine. Pursuant to Rule 26(b)(3), “[o]rdinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by another party or its representative.... ” Fed. R. Civ. Proc. 26(b)(3). However, this is a qualified immunity and such materials may be discovered if another party shows that it has “substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means.” Id. Opinion work product generally remains immune from discovery unless the requesting party demonstrated “substantial need” and “undue hardship.” See Hickman v. Taylor, 329 U.S. 495, 510, 67 S.Ct. 385, 91 L.Ed. 451 (1947) (“Not even the most liberal of discovery theories can justify unwarranted inquiries into the files and mental impressions of an attorney.”); Upjohn Co. v. United States, 449 U.S. 383, 401-402, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981) (“As Rule 26 and Hickman make clear, such work product cannot be disclosed simply on a showing of substantial need ... [A]far stronger showing of necessity and unavailability by other means would be required than is needed to justify ordinary work product.”). As the magistrate judge acknowledged, exceptions to the work product privilege are “very rare” and exist only in “extraordinary circumstances.” See Chaudhry v. Gallerizzo, 174 F.3d 394, 403 (4th Cir.1999) (finding that appellant failed to present the “very rare and extraordinary situation justifying disclosure of opinion work product”); In re Allen, 106 F.3d 582, 607 (4th Cir.1997) (“[OJpinion work product enjoys a nearly absolute immunity and can be discovered only in very rare and extraordinary circumstances.”). Here, the magistrate judge appears to have found that the work product doctrine would generally apply, but that Meihao satisfied the rare “substantial need” and “undue hardship” exceptions. While the magistrate judge may have ultimately rejected Leviton’s work product arguments based on these exceptions, we are not convinced that Leviton’s arguments were frivolous. Levitón cannot be required to concede that Meihao satisfied the “substantial need” and “undue hardship” exceptions simply because a defense of inequitable conduct was raised. Moreover, Levitón could not possibly know in advance that the magistrate judge was “mere days away” from releasing an opinion granting Meihao’s motion to compel. Thus, we conclude that the district court clearly erred by finding that Levitón engaged in vexatious litigation by raising frivolous work-product objections.
Conclusion
For the reasons provided above, the judgment of the District Court is
VACATED AND REMANDED.

. Leviton suggests that the district court found that Meihao committed inequitable conduct per se based on "copying” the claims. This is incorrect. The district court concluded that the copying of claims is "essentially material per se ” but not inequitable conduct per se.

. Levitón argued that such a bench trial, while necessary to resolve the inequitable conduct issue, would be unjustified because the case was closed and for other reasons stated in the opposition.