NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

---

**ARLINGTON INDUSTRIES, INC.,**
*Appellant,*

**v.**

**BRIDGEPORT FITTINGS, INC.**
*Cross-Appellant.*

---

2013-1400, -1401

---

Appeals from the United States Patent and Trademark Office, Patent Trial and Appeal Board in Reexamination No. 95/000,196.

---

Decided: August 29, 2014

---

KATHRYN L. CLUNE, Crowell & Moring, LLP, of Washington, DC, argued for appellant. With her on the brief were AMIR D. KATZ, of Washington, DC; SCOTT L. BITTMAN, of New York, New York. Of counsel was JACOB ZIEMOWIT ZAMBRZYCKI. Of counsel on the brief was CARTER G. PHILLIPS, Sidley Austin LLP, of Washington, DC.

MARK E. UNGERMAN, Ungerman IP PLLC, of Washington, DC, argued for cross appellant.

―――――――――――

Before PROST, *Chief Judge*,[*] LOURIE, and LINN, *Circuit Judges.*

LINN, *Circuit Judge*

Arlington Industries, Inc. ("Arlington") appeals from the decision of the Board of Patent Appeals and Inferences ("Board") on *inter partes* Reexamination No. 95/000,196, affirming the final rejection of claims 1, 5, and 6 of U.S. Pat. No. 6,521,831 ("the '831 patent") as obvious under 35 U.S.C. § 103(a) in view of the prior art. Bridgeport Fittings, Inc. ("Bridgeport"), which filed the *inter partes* reexamination request, cross appeals from the Board's decision on issues that concern the Board's affirmance of the patentability of claims 3 and 4 of the '831 patent. For the reasons that follow, we affirm the Board's decision except as to claim 3, in which respect we vacate and remand.

## I. BACKGROUND

Arlington and Bridgeport are direct competitors in the market for electrical connectors. Electrical connectors make connections between a junction box and electrical conductors, such as metal-clad cables, using an access hole in the junction box. *See* '831 Patent col. 1 ll. 44–49. Arlington owns the '831 patent, which relates to a duplex electrical connector, allowing two cables to be connected to a junction box via a single access hole. *See id.* at col. 1 ll. 59–61. Claim 1 of the '831 patent recites:

―――――――――――

[*] Sharon Prost assumed the position of Chief Judge on May 31, 2014.

1. A duplex electrical connector comprising:

a) a housing having a cylindrical outbound end, a generally oval inbound end, and an interior channel linking said inbound and said outbound end;

b) a pair of parallel openings in said inbound end;

c) a tubular spring steel cable retainer secured in each of said openings in said inbound end for accepting separate cables, said retainers including a set of inwardly extending tangs to receive and engage said separate cables inserted from said inbound end and guide said separate cables toward said cylindrical outbound end in a manner that said separate cables are advanced to said outbound end, said inwardly extending tangs restricting removal of said separate cables by force applied on said separate cables from said inbound end; and

d) a tubular spring steel adapter secured to said cylindrical outbound end of said housing, said adapter having outwardly extending tangs.

'831 Patent col. 6 l. 64–col. 7 l. 15.   Claim 3 depends from claim 1, adding that the inbound end has within it an oval-shaped insert with a pair of parallel openings with annual ridges in the rearward end of the openings.  *Id.* at col. 7 l. 23–col. 8 l. 3.  Claim 4 also depends from claim 1, adding that the retainers are secured by tangs that snap into place upon insertion.  *Id.* at col. 8 ll. 4–10.  Claim 5 depends from claim 1, adding limitations regarding the number and orientation of the retainer tangs.  *Id.* at col. 8 ll. 11–16.  Claim 6 depends from claim 5, adding limita-

tions regarding the orientation of the cable retainers and a cable passageway. *Id.* at col. 8 ll. 17–24.

Bridgeport sought *inter partes* reexamination of the '831 patent after Arlington accused Bridgeport's Whipper-Snap Duplex Connectors of infringing the '831 patent. *Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*, No. 3:06-CV-1105 (M.D.P.A.).    The Board ultimately affirmed the final rejection of claims 1, 5 and 6 and the patentability of claims 3 and 4.  Claim 1 was found obvious over the combination of U.S. Patent No. 1,295,304 ("Grindle"); U.S. Pat. No. 4,885,429 ("Schnittker"); and U.S. Pat. No. 2,744,769 ("Roeder").  J.A. 23.  Arlington did not separately argue the patentability of dependent claims 5 and 6.  J.A. 44.  The Board affirmed the patentability of claims 3 and 4, ruling that the priority date of those claims antedated at least one of the asserted prior art references.  J.A. 48.  Arlington appeals, and Bridgeport cross appeals.  We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(4).

## II. STANDARDS OF REVIEW

Obviousness is a question of law, reviewed *de novo*, based on underling facts, the findings of which are reviewed for substantial evidence.  *In re Kotzab*, 217 F.3d 1365, 1369 (Fed. Cir. 2000), *Rapoport v. Dement*, 254 F.3d 1053, 1058 (Fed. Cir. 2001).

Likewise, priority under 35 U.S.C. § 120 is a question of law, reviewed *de novo*, based on underlying facts, the findings of which are reviewed for substantial evidence. *In re Daniels*, 144 F.3d 1452, 1455 (Fed. Cir. 1998).

## III. DISCUSSION

### A.  Arlington's Appeal

In its appeal, Arlington raises four primary arguments.  First, it contends that the prior art combination does not result in retainers "secured in each of said open-

ings in said inbound end for accepting separate cables" as required by claim 1. Second, it contends that the combination of the prior art lacks "tangs" that "guide" and "advance[]" cables "toward" the outbound end, as required by claim 1. Third, Arlington argues that the Board failed to identify any prior art that disclosed or suggested the claimed "tubular spring steel adapter" and that, in fact, the prior art teaches away from such an adapter. Fourth, it argues that the Board erred in rejecting Arlington's evidence offered in support of secondary considerations of non-obviousness.

Bridgeport counters by arguing that because Arlington did not raise the issue of claim construction to the Board, it has waived argument regarding the claim language "secured in each of said openings in said inbound end." Bridgeport argues that in any event, Arlington misunderstands the end point of the edge of the housing and that the prior art combination does result in retainers secured in the inbound end of the housing. Bridgeport also contends that the Board correctly found that the prior art guides or permits cable movement to the outbound end "in a manner commensurate in scope with the language of independent claim 1," J.A. 25, and that Arlington did not propose an alternative construction to the Board, thus again waiving the argument. Bridgeport further argues that use of spring steel widely was known, that Arlington did not contest this knowledge at the Board, and that therefore the Board had substantial evidence on which to determine that one of skill in the art would have substituted one known element for another made of spring steel. Lastly, Bridgeport argues that the Board properly rejected the evidence of secondary considerations because Arlington's products do not embody the claims and thus lack a nexus to the claims, that Arlington failed to provide adequate evidence that customers bought Arlington's products due to allegedly claimed features, and that Arlington failed to provide evidence of market

share and thus failed to show that its products were commercially successful.

### 1. The claimed "retainers"

Claim 1 requires retainers "secured in each of said openings in said inbound end for accepting separate cables." Arlington argues that the combination of Grindle with Schnittker (a) lacks a retainer entirely, (b) results merely in retainers secured *to* each opening of the connector, and (c) would not have been obvious because there was no motivation to combine and because the combination requires substantial reconstruction of the prior art. The Board found that Grindle is a duplex connector with "parallel inlets . . . adapted to receive armor clad electrical wires" that uses a set screw to hold the cables in place. J.A. 12–14; *see also* Grindle fig. 1. The Board further found that Schnittker discloses a single-cable connector with a metal grounding ring with tangs that engage a metal-clad cable. J.A. 14–15; *see also* Schnittker col. 2 ll. 22–31. We see no error in these factual findings.

The Board in affirming the examiner's final rejection found it obvious to combine Grindle and Schnittker, substituting Grindle's single set screw with two grounding rings as taught by Schnittker, with one grounding ring per cable. J.A. 58. The Board reasoned that the resulting combination yielded retainers "secured in each of said openings in said inbound end for accepting separate cables" and thus rendered the limitation obvious. J.A. 23–35.

Arlington argues that the examiner's rejection was improper because Schnittker's grounding ring cannot be a retainer because it merely grounds a metal-clad cable rather than restricting its removal. The Board disagreed, finding that Schnittker discloses that the grounding ring has a number of tangs that, when the grommet is tightened, "engage the outer surface . . . of [a] metal clad cable . . . to create a force which resists a rearward force

that could pull the cable out of the connector . . . ."  J.A. 15.  This finding is supported by substantial evidence in Schnittker's disclosure.  *See, e.g.*, Schnittker col. 5 l. 66–col. 6 l. 2 (tangs are shaped and arranged "to aid in gripping the metal clad cable . . . ."), *id.* at col. 7 ll. 48–53 (grounding ring cannot move rearwardly once a gland nut is tightened to compress a grommet).  Accordingly, we see no error in the Board's conclusion that the combination of Schnittker with Grindle would have included the claimed retainer.

Arlington also argues that Schnittker's grounding ring is not in the "opening in said inbound end."  Arlington first argues that the combination results in the grounding ring being secured "to" the opening rather than "in" the opening.  Arlington further argues that the grounding ring cannot be in the "inbound end" of the connector because the ring is placed towards the back of the connector disclosed in Schnittker.  Both arguments fail, however, because Arlington focuses only on the spatial argument of components within the Schnittker-type connector separately from the Grindle-type connector.  The proper focus is on the Grindle-Schnittker combination.  The examiner's combination involves placing two Schnittker-type connectors on the inbound end of a Grindle-type duplex connector.  In that context, the connector's "housing" is the Grindle-type duplex connector together with two of the Schnittker-type connectors, and we find no error in the Board's conclusion that the grounding rings of Schnittker are secured in the inbound end of that housing as a whole.

This court further sees no error in the Board's affirmance of the examiner's determination that substitution of Grindle's set screw with the Schnittker-type retainers merely was the substitution of one known element for another.  Arlington contends that there was no motivation to combine, but the Board specifically noted that the "combination would maintain equal resistance on each

inlet in a way that the single screw of Grindle could not." J.A. 31. Arlington does not attack the Board's explanation, and we see no error in it. Arlington further contends that the combination of Grindle with Schnittker-type retainers would not have been obvious because the combination of Grindle and Schnittker would require "substantial reengineering," citing *In re Ratti,* 270 F.2d 810, 813 (CCPA 1959). However, Arlington itself notes that the combination requires merely threading the parallel openings in Grindle to accept the connectors disclosed in Schnittker, Appellant's Br. 47, a modification that hardly amounts to substantial reengineering. Arlington finally argues that the time-span between the prior art and the filing date of the '831 patent's application undermines any "obvious to try" inference, citing to *Leo Pharma. Prods., Ltd. v. Rea*, 726 F.3d 1346 (Fed. Cir. 2013). However, the Board's decision was not predicated on an "obvious to try" rationale and the facts are unlike those in *Leo*. Here, the art is not unpredictable and Arlington does not argue that the prior art taught away from the combination.

## 2. The claimed "tangs"

Claim 1 further requires that the retainer has tangs to "guide said separate cables toward said cylindrical outbound end in a manner that said separate cables are advanced to said outbound end." Arlington contends that the combination of the prior art lacks "tangs" that "guide" and "advance[]" cables "toward" the outbound end. Arlington argues that the tangs of Schnittker's grounding ring do not guide or advance the cables to the outbound end because the tangs instead merely direct the cable straight down the bore. Appellant's Br. 52. Arlington contends that the shoulders of the Grindle-Schnittker housing, and not the tangs, actually guide the cables. Arlington further argues that the tangs cannot "advance" the cable because Schnittker's grounding ring is not locked into place—by tightening a gland nut and grommet—until the cable already is fully inserted. Arlington

lastly repeats its argument that the tangs are not in the inbound end of the connector.

Bridgeport counters that Arlington did not propose any construction for these terms and that under the terms' broadest reasonable construction, the Board concluded correctly that "the inwardly extending tines of Schnittker's grounding ring . . . incorporated into Grindle's duplex connector would function to receive, engage, and guide or permit forward movement of the metal clad cables from the inbound end through the grounding ring and towards an outbound end, in a manner commensurate with the language of independent claim 1." J.A. 25.

Arlington's arguments are not persuasive. Arlington's argument that the examiner's combination does not advance cables toward the outbound end, but only straight down the bore of the housing, assumes that the duplex connector must have an offset outbound end. However, an offset outbound end is not claimed. Moreover, even with an offset outbound end, straight down the bore still is "toward" the outbound end. That the shoulders of the housing provide *additional* guidance and advancing toward the outbound end does not negate the guidance and advancing initially provided by the tangs. Further, though a cable must already be fully inserted into Schnittker's grounding ring before the ring is tightened and locked into place, the grounding ring's tangs engage the cable before that point. *See* Schnittker at col. 7 ll. 33–37. Moreover, Arlington does not appear to have presented this particular argument to the Board in the first instance. Lastly, the argument that the tangs are not in the inbound end of the connector has been addressed and rejected above.

### 3. The claimed "tubular spring steel adapter"

Claim 1 additionally requires a "tubular spring steel adapter" in the outbound end of the housing. The Board found that it would have been obvious to substitute Roed-

er's bushing for Grindle's lock-nut and threads as an adapter for Grindle's housing, J.A. 32, and that it further would have been obvious to make the adapter out of spring steel, *id.* at 33–34. Arlington argues that the Board failed to identify any prior art that disclosed or suggested an "adapter" made of spring steel and that the art relied on by the Board actually teaches away from using spring steel. Arlington contends that to the extent it did not raise this specific argument to the Board, the implications of the spring steel limitation were known at the Board and thus may be addressed here. Bridgeport counters that Arlington did not argue to the Board that the use of spring steel for the adapter would not have been obvious and that, therefore, Arlington waived the argument. Bridgeport further contends that the Board had substantial evidence on which to conclude that use of Roeder's bushing with the Grindle-Schnittker combination merely involved the substitution of one known element for another with a predictable benefit.

Arlington argued to the Board that the combination of Roeder with Grindle was inadequate because Roeder's bushing would not establish a proper grounding mechanism and because it was not intended as a permanent connector. *Id.* The Board disagreed with Arlington, noting first that both arguments failed because they were directed to unclaimed limitations. *Id.* We agree with the Board's conclusion, as the claims recite neither a grounding mechanism nor a connector that is permanent.

Arlington did not argue to the Board that the examiner lacked evidence to support the substitution of spring steel as the material. However, Arlington contends that it preserved the issue for this court's review when it argued to the Board that Roeder did not disclose the claimed spring steel adapter's outwardly extending tangs, prompting the Board to acknowledge that Roeder's bushing was not made of spring steel. However, the examiner already had concluded that Roeder's bushing was not made of

spring steel and would have to be modified, concluding that it would have been obvious "to allow for continual reuse." J.A. 1208–09. Though Arlington disputed a number of aspects concerning the combination with Roeder—such as whether the resulting combination would establish a ground connection or whether Roeder was intended to be permanent—the examiner's and the Board's conclusion that it would have been obvious to make the Roeder bushing from spring steel was not one of the disputes that was raised.

Arguing against waiver, Arlington relies on *In re Baxter Intern., Inc.*, 678 F.3d 1357, 1362 (Fed. Cir. 2012) for the proposition that no waiver exists when the appellant raised timely arguments regarding the examiner's analysis of a limitation. Here, however, Arlington did not raise any argument before the Board that the substitution of spring steel for the adapter was not obvious. Arlington similarly relies on *Wm. Wrigley Jr. Co. v. Cadbury Adams USA LLC*, 683 F.3d 1356, 1360–61 n.3 (Fed. Cir. 2012) for the proposition that presenting the "essence of its present arguments" to the Board is sufficient to preserve the issue. Here, however, Arlington's arguments regarding the adapter limitation were not, in essence, that it would not have been obvious to make the adapter of spring steel. Arlington argued that the Board's combination lacked proper grounding and was not a permanent connector. The Board concluded that these were unclaimed limitations and further that the use of spring steel would resolve those issues in any event. Arlington did not argue that spring steel would not have been obvious to use in the first instance. Lastly, Arlington relies on *Warner-Lambert Co. v. Teva Pharmaceuticals USA, Inc.*, 418 F.3d 1326, 1338 n.1 (Fed. Cir. 2005) for the proposition that it is sufficient to raise the general legal issue below. However, the legal principle from *Warner-Lambert* is that "this court does not review supporting arguments, but only the decisions reached by the trial court." *Interactive*

*Gift Express, Inc. v. Compuserve, Inc.*, 256 F.3d 1323, 1346 (Fed. Cir. 2001) (citing *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1540 (Fed. Cir. 1983)). The examiner concluded that it would have been obvious to make the adapter out of spring steel to allow for continuous reuse. J.A. 1208–09. Rather than disputing that decision, Arlington instead disputed whether the Roeder adapter would provide proper grounding or permanence. Unsurprisingly, the Board did not further discuss the obviousness of spring steel because its decision was not challenged. We "generally do not consider arguments that the applicant failed to present to the Board" and see no exceptional circumstances here requiring otherwise. *Baxter*, 678 F.3d at 1362.

In any event, the references before the Board provide substantial evidence to support the substitution of spring steel. Schnittker's grounding ring indisputably is spring steel and was known to be used with the heavier metal-clad cables. Accordingly, the record does provide substantial evidence to support its finding that a person of ordinary skill in the art would have known of spring steel's grounding properties and its suitability for working with metal-clad cables.

Arlington further contends that Roeder actually teaches away from the claimed invention. Here, Arlington argues that Roeder teaches away because as disclosed, the Roeder adapter was too weak to function with metal clad cables. Appellant's Br. 60–61. Arlington is referring to the Board's finding that it would have been obvious to use spring steel for the adapter "to allow for continual reuse to address the increase in weight" from the metal-clad cables. J.A. 34. However, the Board did not conclude that the combination would not function with metal clad cables (only that modification would be needed for continual reuse), and Arlington presents no evidence that the combination would in fact be nonfunctional. Thus, because substantial evidence supports the Board's conclu-

sion that the combination was at least functional, Arlington misplaces its reliance on *In re Gordon*, 733 F.2d 900, 902 (Fed. Cir. 1984) ("If references taken in combination would produce a 'seemingly inoperative device,' . . . such references teach away from the combination and thus cannot serve as predicates for a prima facie case of obviousness.").

### 4. Secondary Considerations

Arlington offered evidence of commercial success and of a long-felt but unresolved need.  The Board rejected both forms of evidence for lack of a demonstrated nexus to the claimed invention.  Arlington argues that this was error.  Arlington contends that its connectors embody the claimed inventions, sell in large numbers, and sell at a premium to non-embodying connectors.  Arlington further argues that it was not required to present evidence of market share because Arlington and Bridgeport are the only participants in the relevant market, Bridgeport did not produce its sales figures, and a district court already concluded that each infringing Bridgeport sale was likely a lost Arlington sale.  Bridgeport contends that the Board correctly determined that Arlington's evidence did not establish commercial success because there was insufficient evidence of Arlington's market share.

Arlington's evidence of commercial success included sales figures of its SNAP²IT® ("SNAP²IT") connectors.  Arlington argues that these connectors embody the claimed inventions and that the sales figures demonstrate the invention's commercial success.  To demonstrate that the SNAP²IT connectors embody the claims, Arlington submitted to the Board a claim chart in which Arlington's expert charted the limitations of the '831 patent's claims to the SNAP²IT products.  Arlington contends that this established a *prima facie* case of a nexus between SNAP²IT's commercial success and the claimed invention, citing *Crocs, Inc. v. Int'l Trade Com'n*, 598 F.3d 1294,

1311 (Fed. Cir. 2010) (citing *In re GPAC Inc.,* 57 F.3d 1573, 1580 (Fed. Cir. 1995)).  Arlington then concludes that because conventional duplex connectors sell for, on average, 75% less per unit than similarly insulated SNAP²IT connectors, Arlington's SNAP²IT sales figures demonstrate the success of the claimed invention.  Appellant's Br. 72.

The Board found Arlington's showing to fall short in part because the sales figures demonstrated that 96% of the SNAP²IT sales were for duplex connectors with an unclaimed feature: an insulated throat design.  Without any ability to assess the overall market, the Board did not err when it concluded that it was unable to gauge whether the SNAP²IT sales actually constituted commercial success or any meaningful share of the duplex connector market.  Arlington contends that Bridgeport is the only other participant in the relevant market and that because Bridgeport did not produce its sales figures, it could not provide the evidence in question.  However, the relevant market is for duplex connectors in general, not solely Bridgeport's connectors.  Arlington never offered evidence of the entire market for insulated-throat duplex connectors or uninsulated-throat duplex connectors relevant to the remaining 4% of the SNAP²IT sales.  Arlington argues that it did not need to provide that evidence because a district court concluded that every Bridgeport Whipper-Snap duplex connector sold was a lost sale of Arlington's SNAP²IT connector.  That finding also is insufficient because it does not establish that either product is a commercially successful duplex connector in the context of the overall market of duplex connectors.

Arlington did submit customer declarations and publications praising the SNAP²IT connectors, but the Board discounted their weight, finding the declarant's statements vague and otherwise unpersuasive.  Because the Board's assessment of secondary considerations is sup-

ported by substantial evidence, we have no reason to upset it.

For the foregoing reasons, we affirm the Board's decision on obviousness as to claims 1, 5 and 6.

### B.  Bridgeport's Cross Appeal

Bridgeport cross appeals the Board's decision concerning the priority date of claim 1 and the Board's affirmance of the patentability of claim 3.  The cross appeal concerning claim 1's priority date implicates not only the patentability of claim 1, but also of claim 4, which depends from claim 1 and was found to be patentable based on claim 1's priority date.

The '831 patent issued from Pat. Appl. No. 09/941,341 ("the '341 application), filed on August 29, 2001.  That application is a continuation-in-part of U.S. Pat. App. No. 09/792,185 ('185 application), filed on February 23, 2001, which is a continuation-in-part of U.S. Pat. App. No. 09/373,427 ("'427 application"), filed on August 13, 1999.  The examiner and the Board found that claim 1 was entitled to the August 13, 1999 date of the '427 application.  Like the '341 application, the '185 and '427 applications describe a duplex connector with an oval-shaped inbound end with a large, single cavity and an insert plugging that cavity to divide it into a pair of parallel openings.  However, the '341 application includes, for the first time, a discussion of a housing that does not use this insert, instead having an inbound end with an integrally-formed pair of openings.  '831 Patent col. 2 ll. 42–48.

Bridgeport argues that claim 1 of the '831 patent is entitled only to the August 29, 2001 date of the '341 application.  Bridgeport's argument centers on the '831 patent's description of an insert as distinct from the connector's housing.  *See, e.g.*, '831 patent col. 1 ll. 52–53 ("[t]he inbound end of the housing is adapted to accept an insert containing" the two openings), col. 2 ll. 6–9 ("The

duplex connector of the present invention could be made even simpler by modifying the inbound end of the connector housing to hold the cable retainers. Modified in this manner, the insert could be eliminated . . . ."). Because the '831 patent's claim 1 requires that the pair of parallel openings be in the "housing," Bridgeport contends that the claim cannot encompass a connector that uses an insert to define the openings. And because the '341 application was the first to discuss a housing that does not use an insert, Bridgeport argues that therefore claim 1's priority date only can be August 29, 2001. Arlington counters that substantial evidence supports the Board's conclusion that claim 1 is entitled to the August 13, 1999 priority date because nothing in the relevant disclosures or the claim would limit the openings to exist only as part of an insert.

The examiner and the Board concluded that in light of Figures 1 and 2 of the '427 application—which illustrate a connector with a pair of openings in an insert—a person of ordinary skill in the art would have understood the inventors to possess a duplex connector with a pair of parallel openings in the inbound end of the housing and that claim 1 is not limited to having openings only defined within an insert. J.A. 46–47. We find no error in that decision. In reexamination, the claims must be given their broadest reasonable interpretation. *In re Trans Texas Holdings, Corp.*, 498 F.3d 1290, 1298 (Fed. Cir. 2007) (quoting *In re Yamamoto*, 740 F.2d 1569, 1571 (Fed. Cir. 1984)). Under that standard, the claim merely requires that the inbound end of the housing be generally oval and have a pair of openings. No aspect of the claims requires the housing, much less the inbound end of the housing, to have a unitary structure. Thus, an insert is not excluded by the claim. Indeed, claim 3 depends from claim 1 and further adds that the pair of parallel openings is included in an insert secured within the inbound end of the housing. '831 patent col. 7 ll. 23–26.

Bridgeport does, however, accurately identify error in the Board's handling of claim 3. The examiner concluded that claim 3 was entitled only to the August 29, 2001 filing date because the claim requires that the walls of the insert include an annular ridge, and none of the parent applications supported a disclosure of that annular ridge. J.A. 2126. Arlington did not dispute this finding. J.A. 1204. Thus, the examiner considered Bridgeport's asserted prior art on the merits but found that it did not establish unpatentability. J.A. 1218. The Board affirmed but did so on the basis that Bridgeport's asserted prior art did not antedate the August 13, 1999 priority date of claim 1. J.A. 48. This was error because the examiner found, without dispute from either party, that claim 3 was entitled only to the later August 29, 2001 priority date.

Arlington urges this court to affirm the patentability of claim 3 as being unobvious, but the Board did not pass on that issue and we decline to consider it in the first instance. *See SEC v. Chenery Corp.*, 332 US 194, 196 (1947). Because the Board relied on erroneous grounds, we vacate the decision as to claim 3 and remand for further proceedings.

## IV. CONCLUSION

For the reasons discussed above, the Board's decision is affirmed with respect to claims 1, 4, 5 and 6. The Board's decision is vacated with respect to claim 3, and the case is remanded so that the Board may consider the patentability of that claim in view of the appropriate priority date.

## AFFIRMED-IN-PART, VACATED-IN-PART, AND REMANDED

### COSTS

Costs to Bridgeport.